A03A2145. GARVIN v. SECRETARY OF STATE.
(596 SE2d 166)

ANDREWS, Presiding Judge.

We granted Jim Garvin's[1] application for discretionary appeal to review the judgment of the superior court affirming the decision of the Commissioner of Securities[2] that Garvin sold unregistered securities, and did so without himself being registered as a dealer or

---

[1] Garvin appeals individually and d/b/a The Garvin Agency.

[2] The Secretary of State, acting as Commissioner of Securities, rendered her final decision reviewing the decision of the administrative law judge (ALJ) pursuant to OCGA § 50-13-41 (d). The Commissioner's decision was reviewed by the superior court pursuant to OCGA § 50-13-19.

salesperson authorized to sell securities. For the following reasons, we affirm.

In 1999, Garvin, acting as a commissioned sales representative for Bee Communications, Inc., sold Lexa Kommor five coin-operated payphones for $7,000 each. According to Kommor, she agreed to pay the $35,000 sum for the payphones because Garvin packaged and sold them to her as part of an investment venture whereby she purchased the payphones from Bee, and then was immediately referred by Garvin to an equipment lease program under which she leased the payphones back to ETS Payphones, Inc. for a term of five years. Kommor said that Garvin represented to her that ETS would operate and maintain the payphones and that, regardless of the revenue generated by each payphone, she would receive a fixed monthly income on her investment of $75 per month on each payphone. ETS subsequently declared bankruptcy in 2000, and Kommor lost her investment.

1. We find no error in the determination made by the Commissioner, and affirmed by the superior court that, by collectively selling and promoting these contracts as an investment venture, Garvin sold investment contracts which were classified as securities under the Georgia Securities Act of 1973 (OCGA § 10-5-1 et seq.), and that he did so without registering the investment contracts as securities or registering as a dealer or a salesperson authorized to sell such securities. Garvin does not dispute that he was not registered to sell securities in Georgia pursuant to OCGA § 10-5-3, nor does he dispute that the contracts involved in the investment he described and sold to Kommor were not registered in Georgia as securities under OCGA § 10-5-5. Garvin's primary contention on appeal is that no registration was required because the contracts were not securities under the Georgia Securities Act.

Although the Georgia Securities Act specifically defines an "investment contract" as a security (OCGA § 10-5-2 (a) (26)),[3] it is not the label placed on the instrument by the parties or by the courts that controls. "Instead, the characteristics of the instrument and the

---

[3] An "investment contract" defined as a security

*shall include but is not limited to* an investment which holds out the possibility of return on risk capital even though the investor's efforts are necessary to receive such return if: (A) Such return is dependent upon essential managerial or sales efforts of the issuer or its affiliates; (B) One of the inducements to invest is the promise of promotional or sales efforts of the issuer or its affiliates in the investor's behalf; and (C) The investor shall thereby acquire the right to earn a commission or other compensation from sales of rights to sell goods, services, or other investment contracts of the issuer or its affiliates.

(Emphasis supplied.) OCGA § 10-5-2 (a) (26).

underlying economic reality are the significant factors for a court to consider in classifying an instrument as a security." *Dunwoody Country Club &c. v. Fortson*, 243 Ga. 236, 238 (253 SE2d 700) (1979). Moreover, "the [Georgia] Securities Act is remedial in nature, intended for the protection of investors, and is to be broadly and liberally construed to effectuate its aim. [Cit.]" Id. at 242; *Jaciewicki v. Gordarl Assoc.*, 132 Ga. App. 888, 893 (209 SE2d 693) (1974). Generally, for an investment contract or other instrument to be classified as a security under the Georgia Securities Act there must be "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." (Citation and punctuation omitted.) *Tech Resources v. Estate of Hubbard*, 246 Ga. 583, 584 (272 SE2d 314) (1980) (adopting the test set forth in *Securities & Exchange Comm. v. W. J. Howey Co.*, 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946), as reformulated in *United Housing Foundation v. Forman*, 421 U. S. 837, 852 (95 SC 2051, 44 LE2d 621) (1975)); *Rasch v. State*, 260 Ga. App. 379, 384 (579 SE2d 817) (2003).

Applying these principles, we find the present sale and lease-back contracts were correctly found to be investment contracts within the definition of securities under the Georgia Securities Act. The contracts involved Kommor's investment of $35,000 in sale and lease-back ventures packaged as an investment venture by Garvin. Kommor expected to receive a $75 per month return on each payphone, representing a fixed rate of return on her investment. An "expectation of profits" under the Georgia Securities Act means "some form of *financial return*." *Fortson*, 243 Ga. at 239. We find the return expected by Kommor was a "form of financial return" on investment in a common venture, which even though fixed in amount was sufficient to show an "expectation of profits" ultimately derived from the ability of ETS to profitably manage and maintain the payphones. Id.; *Womack v. State of Ga.*, 270 Ga. 56, 57-58 (507 SE2d 425) (1998); *Rasch*, 260 Ga. App. at 383-385; *D. K. Properties, Inc. v. Osborne*, 143 Ga. App. 832, 834 (240 SE2d 293) (1977).

Garvin contends that the Eleventh Circuit Court of Appeals decision in *Securities & Exchange Comm. v. ETS Payphones*, 300 F3d 1281 (11th Cir. 2002), should control our decision under the Georgia Securities Act. In *ETS Payphones*, the Eleventh Circuit considered whether similar sale and lease-back investment contracts were securities under federal securities laws and concluded they were not. The Eleventh Circuit used a narrow definition of profits to construe federal securities laws and found that, because the monthly lease payments to investors were fixed in amount, the actual earnings achieved by ETS on the payphones were irrelevant, and therefore the investors had no expectation of profits derived from the efforts of

others. Id. at 1284-1285. However, after Garvin filed this appeal, the United States Supreme Court reversed the Eleventh Circuit decision and held that the ETS sale and lease-back arrangement was subject to federal securities laws. *Securities & Exchange Comm. v. Edwards*, 540 U. S. 389 (124 SC 892, 896-899, 157 LE2d 813) (2004). Citing its decision in *SEC v. W. J. Howey Co.*, supra, the U. S. Supreme Court reached a conclusion consistent with Georgia's understanding of the Georgia Securities Act — that the fixed rate of return did not remove the ETS investment contract from the protections afforded investors under applicable securities laws. The U. S. Supreme Court decision in *SEC v. Edwards* was also consistent with the decisions of other states finding that similar ETS Payphones investments are securities under state securities laws. See *Mehl v. Office of Financial Regulation*, 859 S2d 1260 (Fla. Dist. Ct. App. 2003) (finding that similar ETS Payphones sales and lease-back investments are securities under Florida securities law); *Washington Square Securities v. Aune*, 253 FSupp.2d 839, 845, n. 6 (W.D. N.C. 2003) (noting that securities regulators in North Carolina and other states have found similar ETS Payphones investments are securities under state law).

As set forth above, the Georgia Securities Act understands the "expectation of profits" requirement in a broad sense which takes into consideration the characteristics of the investment and the economic realities which motivate the investor. *Fortson*, 243 Ga. at 238. Because Kommor's motivation was to earn a return on her investment in the payphone contracts — a return she reasonably expected was made possible by the efforts of others to profitably manage and maintain the payphones — this satisfied the requirement under the Georgia Securities Act that she had a reasonable expectation of profits to be derived from the efforts of others.

2. Garvin claims the Commissioner, as affirmed by the superior court, erred by concluding that the actions he took in violation of the Act were wilful.

In addition to issuing a cease and desist order against Garvin's violations, the Commissioner approved the imposition of an $8,400 civil penalty on Garvin as an administrative sanction under the Georgia Securities Act based on the conclusion that his conduct in violation of the Act was wilful. Section 10-5-13 (a) (1) of the Act provides for the imposition of administrative sanctions as follows:

(a) Whenever it may appear to the commissioner, either upon complaint or otherwise, that any person has engaged in or is engaging in or is about to engage in any act or practice or transaction which is prohibited by this chapter or by any rule, regulation, or order of the commissioner promulgated or issued pursuant to any Code section of this chapter or which

is declared to be unlawful under this chapter, the commissioner may, at his or her discretion, act under any or all of the following paragraphs:

(1) Impose administrative sanctions as provided in this paragraph:

(A) Subject to notice and opportunity for hearing in accordance with Code Section 10-5-16, unless the right to notice is waived by the person against whom the sanction is imposed, the commissioner may:

(i) Issue a cease and desist order against any person;

(ii) Censure the person if the person is registered as an issuer, dealer, limited dealer, salesperson, limited salesperson, investment adviser, or investment adviser representative;

(iii) Bar or suspend the person from association with a registered dealer, a limited dealer, or an investment adviser in this state; or

(iv) Issue an order against an applicant, registered person, or other person who *willfully* violates this chapter, imposing a civil penalty up to a maximum of $50,000.00 for a single violation or up to $500,000.00 for multiple violations in a single proceeding or a series of related proceedings;

(B) Imposition of the sanctions under this paragraph is limited as follows:

(i) If the commissioner revokes the registration of a dealer, limited dealer, salesperson, limited salesperson, investment adviser, or investment adviser representative or bars a person from association with a registered dealer, limited dealer, or investment adviser under subparagraph (A) of this paragraph,[4] the imposition of that sanction precludes imposition of the sanction specified in division (iv) of subparagraph (A) of this paragraph; and

(ii) The imposition by the commissioner of one or more sanctions under this paragraph with respect to a specific violation precludes the commissioner from later imposing any other sanctions under this paragraph with respect to the violation;

(C) For the purpose of determining the amount or extent of a sanction, if any, to be imposed under subparagraph (A) of this paragraph, the commissioner shall consider, among other factors, the frequency, persistence, and *willfulness* of the

---

[4] See OCGA § 10-5-4 for related provisions regarding denial, suspension, or revocation of a registration, and bars to association.

conduct constituting a violation of this chapter or a rule promulgated thereunder or an order of the commissioner, the number of persons adversely affected by the conduct, and the resources of the person committing the violation.

(Emphasis supplied.) The only reference in OCGA § 10-5-13 (a) (1) to wilful conduct with respect to imposition of administrative sanctions is the requirement in § 10-5-13 (a) (1) (A) (iv) that civil penalties be imposed only on those who "willfully" violate the Act, and the statement in § 10-5-13 (a) (1) (C) that, for the purpose of determining the amount or extent of a sanction, the Commissioner shall consider the "willfulness" of the conduct constituting a violation of the Act. However, the Act elsewhere refers to wilful conduct with respect to criminal violations. Section 10-5-24 (a) provides that:

Any person who shall *willfully* violate any provision of this chapter shall be guilty of a felony and, upon conviction thereof, shall be punished by a fine of not more than $500,000.00 or imprisonment for not less than one and not more than five years, or both.

(Emphasis supplied.) Although the Act does not define the term "willfully," we held in *Greenhill v. State*, 199 Ga. App. 218, 220 (404 SE2d 577) (1991), that "willfully" as used in the felony criminal provisions of OCGA § 10-5-24 means "knowingly and intentionally" violating the Act. In other words, before conduct in violation of the Act can be punished as a felony, the violator must have knowingly intended to violate the Act. Id.

We conclude that the term "willfully" in OCGA § 10-5-13 (a) (1) (A) (iv) has the same meaning we construed it to have in OCGA § 10-5-24. Before any of the civil penalties of up to $50,000 for single violations and up to $500,000 for multiple violations can be imposed under § 10-5-13 (a) (1) (A) (iv), there must be a knowing and intentional violation of the Act. By contrast, nothing in § 10-5-13 (a) (1) limited the cease and desist order issued by the Commissioner against Garvin to wilful violations of the Act. Accordingly, the Commissioner was entitled to issue the cease and desist order whether or not Garvin knowingly intended to violate the Act. Although § 10-5-13 (a) (1) (C) also requires the Commissioner to consider the "willfulness" of a violation for the purpose of determining the amount or extent of a sanction, the use of the term "willfulness" in this context does not impose a requirement that the violator's conduct be a wilful violation of the Act before a sanction can be imposed. Rather, it directs

that, whether or not the Act requires wilful conduct to justify imposition of a particular sanction, before determining the amount or extent of the sanction, the Commissioner shall consider, among other factors, the degree (if any) to which the violator's conduct shows a knowing and intentional violation.

The Commissioner, as affirmed by the superior court, imposed the $8,400 civil penalty under alternative constructions of the term "willfully" in OCGA § 10-5-13 (a) (1) (A) (iv). These constructions were based in part on the findings of fact and conclusions of law made by the ALJ, which were adopted by the Commissioner and the superior court. Under one construction, the Commissioner found that the term "willfully" did not require a finding that Garvin knowingly intended to violate the Act, but only required proof of intention in the sense that Garvin was aware of committing acts which were violations. As set forth above, we reject that construction of the statute. Alternatively, the Commissioner found that, even if "willfully" means a knowing and intentional violation of the Act, the undisputed facts showed that Garvin acted wilfully and the imposition of a civil penalty was proper.

Garvin claimed his conduct was not wilful because he relied in good faith on the advice of counsel that the ETS sale and lease-back arrangements did not violate Georgia or federal securities laws. In support of this claim, the record shows that Garvin reviewed a 1996 letter by an attorney to the president of ETS which gave the opinion that, because ETS was merely the lessee of the payphones and not the seller, ETS was not offering a security as defined by Georgia or federal securities laws. The record also shows that Garvin reviewed a 1998 letter by an attorney sent to the North Carolina Securities Division on behalf of Bee Communications (which paid Garvin commissions on his sales), which offered the opinion that Bee was not selling securities in North Carolina because, among other reasons, the sale and lease-back arrangement did not satisfy the definition of a security under the requirements set forth in the U. S. Supreme Court decision in *SEC v. W. J. Howey Co.*, supra. Garvin also said he relied on a 1997 Sixth Circuit Federal Court of Appeals decision finding that the ETS sale and lease-back arrangement was not a security under federal securities laws. Finally, Garvin claimed in an affidavit that, before he sold any payphones, he made a "good faith effort to find out about these telephone sales" when he called the office of the Georgia Secretary of State and "asked them about the telephone business." He stated that an unnamed person told him to call federal authorities to get answers to his questions, and also told him that as far as they knew there were "no complaints about ETS and the telephones" and "everything was alright." Considering these facts, the Commissioner rejected Garvin's claim that his conduct was not wilful because he relied in good faith on the advice of counsel, and found that his

conduct in violation of the Act was wilful because, under the circumstances, he "failed to conduct a reasonable inquiry."

In determining whether or not conduct found in violation of the Act was wilful, a claim by the violator that he or she acted in reliance on the advice of counsel is a factor which may be considered along with all other circumstances relevant to the issue of whether the conduct was a knowing and intentional violation. See William E. Aiken, Jr., Element of Scienter as Affecting Criminal Prosecutions for Violation of Federal Securities Law, 20 ALR Fed. 227, § 16 (2003); see also *Hicks v. Brantley*, 102 Ga. 264, 269-271 (29 SE 459) (1897). Generally, a violator's reliance on the advice of counsel may be established by showing that, after seeking the advice of counsel as to the legality of contemplated action and fully disclosing to counsel all the facts relevant to the advice sought, the violator took the action later found to violate the Act in good faith reliance on advice received from counsel that the contemplated action did not violate the Act. Id. Moreover, a wilful violation of the Act may be shown, not only by direct evidence that the violator knowingly and intentionally violated the Act, but also by evidence that, under the circumstances, the violator's conduct was so reckless or so charged with indifference to the consequences as to justify a finding of wantonness equivalent in spirit to a knowing and intentional violation. *Truelove v. Wilson*, 159 Ga. App. 906, 907-908 (285 SE2d 556) (1981).

The ALJ considered this case, including the issue of whether Garvin acted wilfully, under the provisions of the Office of State Administrative Hearings. OCGA § 50-13-40 et seq. Without conducting an evidentiary hearing, the ALJ rendered an initial decision granting the Commissioner's motion for a summary determination based on the pleadings and affidavits of record. Ga. Comp. R. & Regs. r. 616-1-2-.15. Even though the ALJ pointed to no direct evidence that Garvin wilfully violated the Act, the ALJ nevertheless determined on the basis of the record that there was no genuine issue of material fact and that, as a matter of law, Garvin acted wilfully because he "failed to conduct a reasonable inquiry under the circumstances." This finding fails to address the relevant issue of whether, under the circumstances, Garvin's conduct was so reckless or so indifferent to the consequences that it displayed a wantonness equivalent in spirit to a knowing and intentional violation. On review pursuant to OCGA § 50-13-41 (d), the Secretary of State, acting as the Commissioner, considered the record and rendered a final decision adopting the ALJ's summary determination that Garvin acted wilfully. On review of the final decision pursuant to OCGA § 50-13-19, the superior court affirmed. Thus, the imposition of the $8,400 civil penalty against Garvin was based on a summary determination on the record which failed to apply the correct legal standard to the facts. Accordingly, we

reverse the portion of the superior court's judgment affirming summary determination that Garvin's conduct was wilful and affirming the penalty, and remand the case with directions that the record on this issue be reconsidered in light of the applicable legal standard. See *Sarrio v. Gwinnett County*, 273 Ga. 404, 406 (542 SE2d 485) (2001); *Fairfax MK, Inc. v. City of Clarkston*, 274 Ga. 520, 522-523 (555 SE2d 722) (2001).

3. We find no merit in Garvin's argument that the decisions set forth in Divisions 1 and 2, supra, were improper retroactive applications of the law. The interpretation of the Georgia Securities Act in these decisions did not create new law, but merely stated what the law had always been. "The question of retroactivity is raised only when a new principle of law is established, either by overruling clear past precedent or by deciding an issue of first impression whose resolution was not 'clearly foreshadowed.' [Cit.]" *United American Ins. Co. v. Ins. Dept. of Ga.*, 258 Ga. App. 735, 739-740 (574 SE2d 830) (2002). Here, the decisions at issue were clearly foreshadowed by the language of the statutes at issue, by the various authorities cited herein, and by a prior ruling of the Commissioner on analogous facts that found the sale of coin-operated telephones as an investment venture constituted the sale of securities under the Georgia Securities Act. *In the Matter of: Dyna Communications Sales Corp.*, No. 50-85-9630, 1986 Ga. Sec. LEXIS 104 (Ga. Commr. Sec., March 28, 1986).

4. Garvin's contention that, even if the investment contracts were securities, he did not sell them in the state of Georgia, was raised for the first time on appeal. We will not consider issues not raised or ruled on in the lower tribunals prior to appeal. *Ga. Dept. of Natural Resources v. Coweta County*, 261 Ga. 484 (405 SE2d 470) (1991). Except as otherwise reversed in Division 2, supra, the judgment is affirmed.

*Judgment affirmed in part and reversed in part and case remanded with direction. Adams, J., concurs. Barnes, J., concurs specially.*

BARNES, Judge, concurring specially.

I concur fully in the analysis of the majority, which affirms the Secretary of State's determination that Garvin sold unregistered securities, and which determines that, to find a wilful violation of the Act, the Commissioner must determine whether Garvin's conduct was so reckless or so indifferent to the consequences that it displayed a wantonness equivalent to a knowing and intentional violation. I write separately to point out that the record is closed, and we have reviewed all the facts in the record. Applying the proper standard to the facts, the superior court can only draw the conclusion that Garvin's conduct was not wilful.

DECIDED FEBRUARY 11, 2004 —
RECONSIDERATION DISMISSED MARCH 4, 2004 — 

*Browning & Tanksley, George T. Smith*, for appellant.
*Thurbert E. Baker, Attorney General, William W. Banks, Jr., John B. Ballard, Jr., Assistant Attorneys General, Robin A. Golivesky*, for appellee.
*McCall, Finney & Phillips, Fred T. Finney*, amicus curiae.